IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

W.K. and E.K. as parents and next friends of
C.K., a minor                                                    PLAINTIFFS

v.                              Case No. 3:11-CV-03045

HARRISON SCHOOL DISTRICT                                         DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Before the Court are the parties' cross-motions for summary judgment.  Plaintiffs filed their

Motion for Summary Judgment (Doc. 11) on May 8, 2012; Defendant filed a Response in Opposition

to Plaintiffs' Motion (Doc. 17); and Plaintiffs filed a Reply (Doc. 27).  Defendant filed its Motion

for Summary Judgment (Doc. 19) on June 4, 2012; Plaintiffs filed a Response in Opposition to

Defendant's Motion (Doc. 26) and a Brief in Opposition (Doc. 28); and Defendant filed a Reply

(Doc. 34).  The parties have requested that this case be decided by the Court on summary judgment.

**I.  Procedural History**

Plaintiffs seek review of a final administrative order that followed a due process hearing

conducted by the Arkansas Department of Education, Special Education Division ("ADE").  The

hearing was held at the request of Plaintiffs, who in their complaint before the ADE alleged that their

disabled child, CK, had been denied a Free Appropriate Public Education ("FAPE") by the public

school system of Harrison, Arkansas, contrary to the requirements of the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  Defendant Harrison School District is a political

subdivision organized and existing under the laws of the State of Arkansas.  Defendant is subject to

the IDEA's requirements because it is a public school system receiving federal funds for its

-1-

educational programming.  Accordingly, Defendant is mandated by federal law to provide a FAPE to all children with disabilities residing within its educational boundaries, including Plaintiffs' disabled child, CK.  *Id.*

In accordance with the provisions of the IDEA, Defendant developed an Individualized Educational Program ("IEP") for CK each year that the child was enrolled in the school district.  To create an IEP for a disabled student, the district assembles a team of educators, specialists, and the child's parents to plan a course of study that will educate the child while taking into account the child's particular disability.  An IEP contains, among other things, information about the child's present level of academic achievement and functional performance, including measurable annual goals and short term objectives; a description of the specific educational services to be provided to the child; and the extent to which the child will be educated in regular education programs.  20 U.S.C. § 1414(d).  In addition, Congress requires that educational services be provided to a child with disabilities, to the maximum extent appropriate, in the regular educational environment, and that no child with a disability be removed to special classes or separate schools unless the child cannot be educated satisfactorily in the regular education environment.  20 U.S.C. § 1412(a)(5).

Turning to the facts in this case, the Court observes that CK is an eleven-year-old child with severe autism, a neurobiological condition affecting how the child interacts with the world.  He is largely non-verbal, has a low cognitive level, and has great difficulty interacting with others.  He has profound behavioral issues that are uncontrolled, and on a regular basis CK exhibits violence towards himself, his teachers, and his fellow students.  The record reflects that, in general, CK cannot be left unattended with other children, as he is likely to injure them.  Plaintiffs admit that CK hits, scratches, bites, and destroys property both at school and at home.  (Doc. 12, para. 5).  CK's

-2-

unpredictable displays of violent and destructive behavior have resulted in injuries to several of his teachers over the course of CK's public education, with the most recent incident causing his para-professional to be rushed to the emergency room in an ambulance.  Apparently, the child punched her in the neck, causing her to lose consciousness. (Doc. 1-1, pp. 5-6; Doc. 25, Admin. Record Vol. III, Tab 7, V-31, pp. 25-30).[1]

A review of the administrative record associated with this case reveals that CK needs constant monitoring and assistance from one to two teachers or para-professionals assigned exclusively to him, and that CK's maladaptive behaviors include destroying toys, eating crayons and playdough, biting the tips off of markers, shredding and eating paper, climbing shelves and cupboards in the classroom, and running from the classroom in an attempt to exit the school.  *See, e.g.*, Doc. 14-1, pp. 116-117; Doc. 25, vol. III, pp. 327-81.  Ever since his kindergarten year in Harrison public schools, CK's IEPs have recommended that he be educated in a self-contained special education classroom, receiving little to no instruction in a regular classroom setting. (Doc. 14-1, pp. 66-67 ).

Plaintiffs withdrew CK from public school and enrolled him in a private school in Missouri in January of 2011.  Case law provides that parents of a disabled child have a "right of unilateral

---

[1] The administrative record is replete with daily behavior logs kept by CK's teachers during the course of his education at Harrison Public Schools.  These logs, which are meticulously kept, show that CK injured his teachers multiple times per day, every day.  Even when confined to a review of incidents in 2009-2010, the violence displayed by this child is staggering.  For example, a 400-page volume of exhibits submitted at the administrative hearing contains contemporaneous reports by CK's teachers describing their cuts, bites, abrasions, bruises, and other injuries endured when providing either one-on-one or two-on-one professional educational services to CK.  This volume of exhibits also contains contemporaneous statements from the school nurse regarding these injuries, as well as Worker's Compensation claims and reports from local medical clinics for these injuries.  *See* Doc. 25, Vol. III, Tabs 5-7.

withdrawal and a right to reimbursement for private tuition, so long as the placement was proper under the Act." *C.B. v. Special School Dist. No. 1, Minneapolis*, 636 F.3d 981 (8th Cir. 2011) (internal citations omitted).  However, "[p]arents are not entitled to reimbursement for the cost of providing a private education to a disabled student unless the school district has not offered a free appropriate public education and the private placement is appropriate." *Gill v. Columbia 93 School Dist.*, 217 F.3d 1027, 1037 (8th Cir. 2000).  In the case at bar, Plaintiffs request that Defendant reimburse them for the costs of tuition and transportation associated with CK's private school enrollment.  Plaintiffs justify their decision to withdraw CK from public school and enroll him in private school by contending that Defendant denied CK a FAPE and failed to provide him an IEP that placed him in the "least restrictive environment" as required by the IDEA, to be educated, as much as possible, with children who are not disabled.  20 U.S.C. § 1412(a)(5).  Defendant responds that a FAPE was provided to CK, that Plaintiffs approved of and participated in creating CK's most recent IEP, and that because of these factors, Plaintiffs should not be compensated for their unilateral decision to enroll CK in private school.

Plaintiffs filed an administrative complaint with the Arkansas Department of Education seeking a due process hearing on the subject of whether a FAPE was provided to CK during the 2010-2011 school year.  On February 28, 2011 and March 3, 2011 the parties participated in a two-day hearing, resulting in a determination by the hearing officer that Defendant clearly failed to provide sufficient and appropriate notice to the parents of CK regarding a proposed change in CK's placement from the school setting to homebound services; however, Plaintiffs' request for reimbursement for private school expenses was denied, as Plaintiffs had failed to provide sufficient evidence and testimony to support their allegation of a denial of a FAPE and justification for CK's

enrollment in private school.

Plaintiffs appealed the hearing officer's decision to this Court pursuant to 20 U.S.C. 1415 (i)(2)(A).  Now on appeal, it is the task of this Court to determine whether the decision made at the administrative hearing was proper, based on the Court's review of the administrative record, as well as the pleadings and supporting evidence filed by the parties.[2]

### III.  Legal Standard

In determining whether summary judgment is appropriate, the burden is placed on the moving party to establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The same standard applies where, as here, the parties file cross motions for summary judgment.  In such a situation, it follows that when the parties agree that there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *U.S. v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978).  Each motion should be reviewed in its own right, with each side, respectively, "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Township. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998).  In order for there to be a

---

[2] Regarding Defendant's Motion to Exclude Plaintiffs' Additional Evidence or Alternatively to Admit Defendant's Additional Evidence (Doc. 32), this is DENIED IN PART and GRANTED IN PART.  Pursuant to 20 U.S.C. 1415 (i)(2)(C)(i) and (ii), the Court "shall receive the records of the administrative proceedings; [and] shall hear additional evidence at the request of a party." Accordingly, the Court accepts all additional evidence provided in this case by either party, even when such was not made a part of the record of the administrative proceeding.  Therefore, Defendant's Motion (Doc. 32) as it pertains to a request to exclude Plaintiffs' additional evidence is DENIED and as it pertains to a request to admit Defendant's additional evidence is GRANTED.

genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Here, both parties have expressly stipulated that although there are some disputes of fact, such disputes are immaterial, and judgment by the court as a matter of law is proper.

An appeal of a due process hearing officer's determination pursuant to the IDEA is governed by certain standards of review.  "Judicial review of agency action may be conducted on the administrative record even if there are disputed issues of material fact." *Independent Sch. Dist. No. 283 v. S.D. by J.D.*, 88 F.3d 556, 561 (8th Cir. 1996).  A district court must determine whether the hearing officer made the correct determination based on a preponderance of the evidence. *Id.*  The reviewing court must give "due weight" to agency decision-making. *Bd. of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley*, 458 U.S. 176, 206 (1982).  The court may not "substitute [its] own notions of sound educational policy for those of the school authorities which they review." *Id.*  Further, in a due process hearing pursuant to the IDEA, the hearing officer is the fact-finder for that proceeding, and as such, had the benefit of hearing the testimony of witnesses and judging their credibility during the hearing.  The Court, therefore, is correct in giving due deference, or "due weight," to the fact-finder as to the factual determinations made as a result of the administrative hearing. *See S.D. by J.D.*, 88 F.3d at 561.

## III.  Discussion

### A.    Procedural Violations and Alleged Denial of a FAPE to CK

#### 1.    FAPE Prior to September 2, 2010

The first issue before the Court is whether a FAPE was provided to CK up until September

2, 2010, the date that Defendant admittedly violated a provision of the IDEA concerning parental notice requirements.  The hearing officer found that Defendant failed to give proper written notice to Plaintiffs regarding the purpose of an IEP team meeting called for CK on September 2, 2010.  This meeting had originally been scheduled for September 7, 2010, with Plaintiffs' full knowledge and consent, in order to discuss CK's educational program and behavioral issues.  The meeting was moved up to September 2, 2010, at the request of the school district's Special Services Director, after CK was suspended from school on August 30, 2010 for causing an injury to his para-professional that resulted in a 911 call and delivery of emergency medical services.  CK's parents were notified on August 30 that the meeting date had changed to September 2, but they were not notified that there was a new purpose for the meeting:  to address CK's assault on his teacher and to recommend that the child receive homebound services rather than services in the school setting.

        The decision by the school to discuss changing CK's placement from in-school to homebound services effectively converted the September 2 conference from a mere "programming and placement IEP team meeting" to a "Manifestation Determination Review," which, pursuant to federal regulations, required that the school district give CK's parents proper notice prior to the meeting.  34 C.F.R. 300.530(e)(1) ("Within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the [Local Educational Agency], the parents, and relevant members of the child's IEP Team...must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents...").

        From the evidence gathered at the administrative hearing, it appears that no notice was given to the parents as to the changed purpose of the September 2 meeting, which caused the parents to feel

"blindsided." (Doc. 1-1, pp. 9-10). The litigation now before the Court is the result of Defendant's admitted error in failing to give appropriate notice to the parents about the changed purpose of the meeting and the parents' ensuing lack of trust in the school district and "parental displeasure with the District's proposal for homebound services..." *Id.* at p. 14. It bears noting that, prior to the September 2 meeting, Plaintiffs and Defendant had cooperated in planning and executing IEPs for the benefit of CK since the child was a pre-schooler, and CK's public school para-professional who had been his life skills teacher during kindergarten, half of first grade, and all of third grade was "praised by the Parents as the one person who knew the Student best." *Id.* at p. 18.

It is for the Court to determine whether CK had been receiving a FAPE up until the admitted procedural violation associated with the September 2 IEP team meeting. The parties agree that prior to September 2, 2010, Plaintiffs had fully participated in the formulation of CK's 2010-2011 IEP. In addition, the hearing officer determined, after evaluating the evidence and hearing the testimony of the witnesses, that CK had made improvements in all educational areas during his tenure in the public schools – with the exception of his uncontrolled violent and destructive behavior – under the IEPs developed for his benefit. (Doc. 1-1, p. 27). The hearing officer stated the following with regard to CK's academic progress in the public school:

> "He may not have been advancing academically and socially as quickly as wished for by the Parents, but records provided by the District do indicate that he had made progress under the previous IEPs. There is insufficient evidence presented by the Parents to negate those findings or that he might not have made progress under the proposed IEP which was rejected by them for implementation through homebound instruction and/or in the school setting."

*Id.*

Determining whether a disabled child has been afforded a FAPE requires careful consideration of the child's goals in relation to his performance. The Supreme Court has discussed

the issue of what, in particular, constitutes a FAPE.  In *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 198 (1982), the court held that "the requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children."  In other words, the State has the obligation to provide "some educational benefit" for a disabled child through "specialized instruction and related services which are individually designed..."  *Id.* at 201. However, the State is not required to provide a particular level of instruction to a disabled student, nor is the State required to meet all educational goals developed for the student to the maximum extent desired by the teachers and/or parents.  Instead, providing a FAPE means providing a "basic floor of opportunity" to a disabled child.  *Id.*  Moreover, what constitutes "progress" in the case of a disabled child should be measured in terms of the educational needs of the disabled child and should be more than *de mimimis*.  *Id.* at 205.

Giving due weight to the findings of the hearing officer, and after the Court's own review of the administrative record, it is clear that CK was receiving a FAPE during the times he was enrolled in Harrison public schools up until September 2, 2010, the date of the IEP team conference after CK was suspended for injuring his teacher.  CK's IEPs were developed in conjunction with CK's parents, who were active participants in his education and consulted with CK's teachers daily as to his behavior and progress. (Doc. 1-1, p. 26).  CK made progress every year on his IEP goals, and his educators were expending significant resources providing individualized services tailored to CK's particular disability.

### 2.     FAPE After September 2, 2010

As to whether a FAPE was offered to CK following the September 2, 2010 IEP team meeting, the Court agrees with the hearing officer that Defendant's admitted failure to give appropriate notice to Plaintiffs as to what would be discussed at the September 2 meeting did not result in a subsequent denial of a FAPE to CK. To constitute a denial of a FAPE, a procedural violation must compromise a student's right to an appropriate education, seriously hamper the parents' opportunity to participate in the formulation process, or cause a deprivation of educational benefits. *Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1011 (8th Cir. 2006). None of these things occurred in this case.

First, the evidence shows that, prior to the September 2 meeting, Plaintiffs were already highly involved in developing CK's educational plan alongside school officials. Plaintiffs arrived at the September 2 meeting with the full advance knowledge that their child had recently violated the school's code of student conduct by acting out with such unprecedented violence as to cause serious bodily injury to a teacher. Plaintiffs also were well aware prior to the meeting that their child had been suspended by the school principal for four days as a result of the attack. These facts indicate that Plaintiffs had enough information about the current situation and their child's educational progress to date to provide some level of participation in the meeting, though not full participation or adequate preparation due to Defendant's failure to give proper advance notice of the meeting agenda. It is obvious that Plaintiffs must have been aware that their child's behavior was an issue and that the safety of the school's staff would be a likely topic of conversation during the meeting. This factor mitigates the effect of Defendant's procedural error.

Second, the evidence also reflects that, following the September 2 meeting, school officials did not unilaterally change CK to a homebound placement without parental approval. Instead,

school officials recognized Plaintiffs' rejection of homebound services for CK and, realizing Plaintiffs' obvious displeasure with the suggestion of homebound placement, attempted to work with Plaintiffs to arrive at an acceptable solution agreeable to all parties, including planning two subsequent IEP team meetings, both of which were attended by Plaintiffs.

The hearing officer determined that after the September 2 meeting, Defendant gave Plaintiffs ample opportunities to revisit the placement issue, but Plaintiffs failed to avail themselves of these opportunities. The record shows that school staff contacted Plaintiffs via telephone and email on September 15 and September 29, 2010, to invite Plaintiffs to participate in follow-up meetings and discussions geared toward  providing school services to CK. On November 9, 2010, at Plaintiffs' request and with proper advance notice given by the school to Plaintiffs, school personnel from CK's IEP team met with Plaintiffs to discuss placement options for CK, though no suggested placements were agreed to by Plaintiffs. At that meeting, the school district agreed to pay for a behavioral evaluation of CK at a private school in Missouri, again at Plaintiffs' request. The IEP team agreed that they would meet again on November 23, 2010 to review the results of the evaluation and discuss CK's placement in Harrison Public Schools in light of the results. Defendant received the results of CK's private evaluation on November 16, 2010, and on November 23, the IEP team met with Plaintiffs for a "programming conference" to discuss how Defendant could provide CK with services considering the evaluation. (Doc. 1-1, pp. 12-13). At that November 23 meeting, several placement options for CK were discussed, including options besides homebound placement. However, it appears that Plaintiffs had already decided by the November 23 meeting that they would enroll CK in a private school, and accordingly rejected Defendant's proposed placements for CK. *Id*.

It is clear to the Court that the hearing officer was correct in stating that Plaintiffs "...did not

provide the District an opportunity to implement the proposed IEP in the school setting on a shortened school day or to implement the proposed IEP through homebound services. [The District] should have been given this opportunity prior to the decision to remove [CK] for private school placement." (Doc. 1-1, p. 19). Plaintiffs' own witness, the director of the private school in which CK has been enrolled since January 2011, was asked during the administrative hearing, "Do you think the Harrison School District is the proper placement for [CK]?" and she responded, "If they can provide the proper supports, yes." (Hearing Transcript, Vol. I, p. 109). This same witness concurred that CK was "very challenging" with "some pretty aggressive behaviors." *Id.* She further noted, "I can't imagine [CK] in a public school setting with hundreds of other children. I would be concerned about his safety and the safety of others." *Id.* at 114. Yet the evidence reflects that Defendant has been providing CK with a one-on-one education tailored to suit his disability, in a self-contained environment, with certified para-professionals and teachers.[3] The private school director was also asked, "...is there anything that you do at your school that couldn't be done in a public school?" and replied, "No." *Id.* at 116.

In light of the discussion above, the Court concludes that a FAPE was offered to CK after the September 2, 2010 conference, but Plaintiffs rejected the offer and instead chose to educate CK elsewhere.

### B.    Plaintiffs' Demand for Private School Reimbursement

The Eighth Circuit has held that "[p]arents are not entitled to reimbursement for the cost of

---

[3]  As a point of reference, it was revealed in the administrative hearing that CK's current private school employs para-professionals who are not all state-certified, unlike the para-professionals in Harrison Public Schools, who are required to hold state certifications. *Id.* at 116. Moreover, at the time of the hearing, the private school was not providing CK with speech therapy or occupational therapy, though those services were provided free of charge to CK at the public school. *Id.* at 126-27.

providing a private education to a disabled student unless the school district has not offered a free appropriate public education and the private placement is appropriate." *Gill*, 217 F.3d at 1037.   In light of the Court's findings above, Plaintiffs are not entitled to reimbursement for any costs associated with their unilateral decision to enroll CK in a private school, as their decision to remove CK from public school was not due to Defendant's denial of a FAPE.

The Court need not reach a determination as to whether the hearing officer correctly concluded that CK's placement at the private school was a more restrictive or less restrictive environment than the self-contained classroom at the public school.  Because Plaintiffs are not entitled to reimbursement for private school tuition and expenses, it is unnecessary for the Court to compare the quality of the educational services provided at the public versus the private school.[4]

## IV.  Conclusion

Defendant's failure to give Plaintiffs proper statutory notice as to the need to change CK's placement for safety reasons did not result in a denial of a FAPE to CK.  After Defendant's violation of the notice provision in September 2010, Plaintiffs were given multiple opportunities over the course of the next three months to meet with Defendant and work out a placement for CK that was agreeable to all.  Plaintiffs refused Defendant's attempts at compromise, having already decided to enroll their child in a private school.  Prior to the September 2 IEP team meeting, which seems to have been fueled not by malice by school officials but by simple mis-communication among the teachers and school administrators, CK was receiving a FAPE pursuant to an IEP his parents had

---

[4] The parties provided the Court with additional evidence that was not presented at the time of the administrative hearing, comparing the quality of educational services delivered at CK's private school to the services at CK's public school. Other post-hearing evidence was submitted to the Court regarding CK's educational performance and behavior at the private school.  Because the Court determined that CK's private school placement was not eligible for reimbursement according to the facts of this case, none of this additional evidence was relied upon by the Court.

been involved in developing and had specifically approved.  If a disabled child's parents refuse to meet and discuss placement with a public school, this cannot justify the parents' unilateral decision to enroll the child in private school and later seek reimbursement from the public school system for private school tuition and transportation costs.

Accordingly, the due process hearing officer's opinion and order in this case is affirmed, and Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED**, while Plaintiffs' Motion for Summary Judgment (Doc. 11) is **DENIED**.

This case is dismissed with prejudice with an order of judgment to be entered contemporaneously herewith.  The parties are instructed to bear their own costs and fees.

IT IS SO ORDERED this 6th day of July, 2012.

/s/ P. K. Holmes, III

P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE